**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 20 B 13380 |
| | ) | |
| MATTHEW T. MUKENSCHNABL and | ) | Chapter 7 |
| KANDY J. MUKENSCHNABL, | ) | |
| | ) | |
| Debtors. | ) | Honorable Janet S. Baer |
| | ) | |
| _____ | ) | |
| | ) | |
| KENNETH PHLAMM, in his individual | ) | Adversary No. 20 A 00346 |
| capacity and on behalf of TRAVEL | ) | |
| EXPRESS AVIATION MAINTENANCE, | ) | |
| INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW T. MUKENSCHNABL, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TRAVEL EXPRESS AVIATION | ) | |
| MAINTENANCE, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

Kenneth Phlamm (the "Plaintiff"), both in his individual capacity and on behalf of Travel

Express Aviation Maintenance, Inc. ("TEAM"), filed an adversary complaint against debtor-

defendant Matthew T. Mukenschnabl (the "Debtor"), seeking a determination that a judgment

debt owed to him and TEAM by the Debtor is not dischargeable pursuant to 11 U.S.C.

1

§§ 523(a)(2)(A), (a)(4), and (a)(6).[1] The matter is now before the Court on the Plaintiff's motion for summary judgment on the claims in Counts I, III, and V of the complaint.[2] For the reasons set forth below, the Court finds that there are no genuine issues of material fact and that the Plaintiff is entitled to judgment as a matter of law on all three counts. As such, the Plaintiff's motion will be granted, and judgment will be entered in his favor on Counts I, III, and V.

## BACKGROUND

The material facts in this case are gleaned from the docket, the pleadings, and the summary judgment statements and responses, as well as the exhibits attached thereto. Among those exhibits are a ruling on the Plaintiff's emergency petition for the purchase of his shares in TEAM by the Debtor (the "Share Purchase Motion"), entered in the Plaintiff's favor and against the Debtor by the Circuit Court of DuPage County (the "state court") after conducting a three-day evidentiary hearing; the three transcripts from that evidentiary hearing; two related rulings subsequently issued by the state court, one determining the valuation of TEAM and the other awarding the Plaintiff prejudgment interest; and the state court's order directing the Debtor to both purchase all of the Plaintiff's shares in TEAM and pay for the Plaintiff's attorneys' fees and

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure, respectively.

[2] The claims in Counts I, III, and V are asserted by the Plaintiff directly against the Debtor. The claims in Counts II, IV, and VI are similar to those in Counts I, III, and V, respectively, but are asserted derivatively against the Debtor by TEAM. On September 17, 2021, an order was entered granting the Plaintiff's request to voluntarily dismiss the derivative claims with prejudice. (Adv. No. 20 A 00346, Dkt. 37.)

costs. (*See* Adv. No. 20 A 00346, Dkt. 1, Exs. D-1, E(1)–(3), F–J.[3]) Many of the facts that follow are drawn from these and other exhibits in the state court record.[4]

This matter arose from a shareholder dispute between the Plaintiff and the Debtor in connection with TEAM, an Illinois company incorporated by the Plaintiff in 2003, which was in the business of maintaining, repairing, and operating various aircraft on behalf of its customers. (Dkt. 11 ¶¶ 14, 16; Dkt. 46-2 at 1.) In 2006, the Plaintiff offered the Debtor a 50% interest in TEAM in exchange for the Debtor's participation in the corporation as director, general manager, and head mechanic. (Dkt. 11 ¶¶ 17, 18.) In addition to these roles, the Debtor served as the president of the company; the Plaintiff—the other director and 50% shareholder of TEAM— functioned as the corporation's vice president and secretary. (*Id.* ¶¶ 13, 15; Dkt. 45 ¶¶ 17, 18.) In his capacity as general manager and president, the Debtor was responsible for the daily operations of TEAM, the services provided to its clients, and the management of its employees. (Dkt. 11 ¶ 20; Dkt. 45 ¶¶ 18, 21.) He also had complete control and authority over TEAM's financials, records, and accounts.[5] (Dkt. 45 ¶¶ 21, 24.)

---

[3] Unless otherwise noted, all docket references are to Adv. No. 20 A 00346.

[4] The Debtor argues that the factual findings considered by this Court should be "strictly limited [to] those matters stated in the transcript" of the state court ruling of December 13, 2019 on the Plaintiff's Share Purchase Motion. (Dkt. 45 ¶ 13; *see also* Dkt. 47 at 5.) Along the same lines, the Debtor suggests that none of the exhibits that were admitted over the course of the three-day state court trial—and which are attached to the pleadings in the instant adversary proceeding—should be reviewed by this Court because the state court made "no specific reference" to those exhibits in its ruling. (Dkt. 45 ¶ 13.) The Debtor's arguments are without merit. It is well established that "a bankruptcy court may look behind a state court judgment in determining dischargeability." *USLife Title Ins. Co. v. Dohm (In re Dohm)*, 19 B.R. 132, 133 (Bankr. N.D. Ill. 1981), *aff'd*, 19 B.R. 134 (N.D. Ill. 1982). *See also Brown v. Felsen,* 442 U.S. 127, 127–28, 138–39 (1979) (holding that when making a determination as to the nondischargeability of debt, a "bankruptcy court may consider evidence extrinsic to the judgment and record of a prior state suit" and "is not confined to a review of the judgment and record in the prior state-court proceedings"). Here, the full record from the prior proceedings is before the Court, and that record has been examined in the Court's analysis of the nondischargeability of debt in this matter.

[5] In paragraph 24 of his statement of facts, the Plaintiff asserts that "[a]s President of TEAM, [the Debtor] had full control and authority over TEAM's financials, records, and accounts." (Dkt. 30 ¶ 24.) In response, the Debtor denies that he ever "restricted" the Plaintiff from accessing those records and accounts. (Dkt. 45 ¶ 24.)

As to the parties' involvement in the business, the Debtor testified that he dedicated much of his time to TEAM, while the plaintiff committed little to no time to the company. (Tr. at 40:13–41:23[6] ("Q: So is it your position that you put . . . 100 percent of your time in for [TEAM] while [the Plaintiff] put in zero percent of his time? A: I think that's accurate.").) Correspondingly, from 2006 to 2018, the Debtor received $1,053,298.72 as compensation for his services to TEAM. (Dkt. 11 ¶ 36.) In contrast, the Plaintiff alleges that he received a distribution of only $147,138.96 over that period in order to cover his shareholder tax liabilities. (Dkt. 1 ¶ 37.)

At the same time the Debtor worked for TEAM, he was also involved in other business endeavors. Specifically, the Debtor worked as a maintenance manager at Tuthill Corporation, one of TEAM's customers that manufactures water pumps, meters, vacuum systems, and blowers and also maintains a fleet of aircraft, both for its corporate business and for use by its officers and directors. (*Id.*, Ex. B ¶ 47; Dkt. 11 ¶ 21; Tr. at 284:10–22.) In addition, the Debtor was a 50% shareholder of Aviation International Affiliates, Inc. ("AIA"), an Illinois corporation which buys, sells, and maintains aircraft and trains and certifies customers in connection with those aircraft. (Dkt. 11 ¶ 23; Dkt. 1, Ex. B ¶¶ 16, 18, 19.)

---

Because the Debtor's response does not address the statement and he fails to provide evidentiary support for his denial, the statement is deemed admitted. L.R. 7056-2(B); *see also* Summary Judgment section *infra*. The Court also notes that although the Debtor technically denies the same allegation in his answer to the Plaintiff's adversary complaint, he explains in the answer that, rather than having authority over the books himself, "he entrusted TEAM employees to prepare the financial records and accounts." (Dkt. 11 ¶ 26.) As the Plaintiff quite rightly notes, the Debtor's admission that he delegated this work to employees under his direction demonstrates that the work was under his control. (*See* Dkt. 30 ¶ 24.)

[6] Transcript references ("Tr. at __") are to the transcript of the state court evidentiary hearings of November 13, 2019, November 14, 2019, and November 15, 2019, which can be found at Docket 1, Exhibit E. The page number references are to those of the transcript itself—not to the pages of the docket entry.

The parties provide little to no information about TEAM's financial condition during the first twelve years of their business relationship. The Plaintiff asserts only that TEAM's gross income increased year after year during that period of time. (Dkt. 1 ¶ 32.) In contrast, the Debtor claims that TEAM faced financial challenges over those years and that he brought his concerns to the Plaintiff during the course of their professional relationship. (Dkt. 11 ¶ 27.)

On September 28, 2018, after the Debtor had reported to the Plaintiff that TEAM was struggling financially, the Plaintiff, his wife, the Debtor, and TEAM's accountant met to discuss the future of the company. (*Id.* ¶ 31.) The Plaintiff alleges that after the meeting, he began reviewing TEAM's QuickBooks accounts in order to address concerns about the company's financial health and stability. (Dkt. 1 ¶ 33.) According to the Plaintiff, that review revealed numerous "improper" expenses incurred primarily from 2013 to 2018, by or for the benefit of the Debtor, totaling more than $295,000. (*Id.* ¶¶ 34, 35.) Among those expenses were $27,969.53 for salaries for the Debtor's children from 2015 to 2018, even though they were not employed by TEAM; $8,046.83 for custom cabinetry in the Debtor's condominium; $1,500 to open AIA; over $6,000 for smoothies from 2014 to 2018; and $5,971.98 for various family vacations. (*Id.* at ¶¶ 34(a), (g), (k), (p), (ee), (hh), (ii).) The Debtor denies that any of the expenses were "improper" and asserts, rather, that he "operated TEAM consistent with his business judgment."[7] (Dkt. 11 ¶ 34.)

---

[7] The Debtor denies that he incurred many of the expenses alleged by the Plaintiff. (Dkt. 11 ¶¶ 34(a), (c)–(e), (g), (h), (j)–(l), (p), (q), (u), (x)–(z), (bb), (cc), (ee), (gg)–(ii).) For those to which he admits, the Debtor contends that there was an unspecified agreement to use funds to support AIA; that a particular expenditure was actually a "bonus" to a TEAM employee; that funds were used to purchase gifts for customers or to repay loans from the Debtor to TEAM; that a payment by check was never negotiated; and that some payments were made in the ordinary course of business of TEAM for valid business purposes. (*See id.* ¶¶ 34(b), (f), (i), (m)–(o), (r)–(t), (v), (w), (aa), (dd), (ff).)

After the Plaintiff's discovery of these alleged expenses, both the situation at TEAM and the parties' professional relationship began to unravel. On October 22, 2018, the Plaintiff filed a complaint against the Debtor in state court, in which he alleged conversion, fraud, and breach of fiduciary duty, among other causes of action, and sought a temporary restraining order ("TRO") against the Debtor, enjoining him from using TEAM assets for purposes unrelated to the company. (Dkt. 45 ¶¶ 29, 30; Dkt. 11 ¶ 41.) The following day, the state court entered a TRO in order to maintain the status quo; that order, among other things, enjoined the Debtor from using TEAM's assets, including the company's employees, customers, vendors, premises, and monies, for "non-TEAM business purposes." (Dkt. 45 ¶ 31; Dkt. 30, Ex. K; *see also id.*, Ex. L at 26:4–5.)

Subsequently, the Debtor took various actions in violation of the TRO. On December 10, 2018, he unilaterally decided to file suit against a number of TEAM customers that had been referred to TEAM by Travel Express Aviation, LLC ("TEA"), an Illinois company co-owned by the Plaintiff and his wife that rents, charters, manages, and trains its customers in connection with various aircraft.[8] (Dkt. 45 ¶ 35; Dkt. 11 ¶ 49; Dkt. 1, Ex. B ¶¶ 11, 12, 14, 15, 42.) At the same time, the Debtor was giving "credits" to the customers that *he* had brought to TEAM. (Dkt. 45 ¶ 35.) He also made the unilateral decision to stop all compensation payments to the Plaintiff through the corporation. (*Id.* ¶ 39.) Thereafter, he unilaterally cancelled the life, health, and disability insurance that TEAM had been providing to the Plaintiff. (*Id.* ¶ 36; Dkt. 11 ¶¶ 53, 57, 63.)

On February 19, 2019, the Plaintiff filed an amended complaint against the Debtor and others in the state court litigation. (Dkt. 1, Ex. B; Dkt. 11 ¶ 68.) The twenty-four count complaint

---

[8] One of TEAM's customers, TEA leased its premises to TEAM, such that the two businesses shared the same lease space. (Dkt. 50 ¶ 4; *see also* Dkt. 45 ¶ 20.)

alleges numerous causes of action against the Debtor, including fraud, fraudulent concealment, conversion, embezzlement, breach of fiduciary duty, usurpation of corporate opportunity, and civil conspiracy. (Dkt 1, Ex. B; Dkt. 11 ¶ 69.) In Count 18, the Plaintiff alleges that the Debtor violated § 12.56 of the Illinois Business Corporation Act (the "IBCA"), 805 ILCS 5/12.56 ("Shareholder remedies: non-public corporations"). Under that count, the Plaintiff contends that the Debtor refused to produce TEAM's accounts and records, misappropriated TEAM's assets for the establishment and operation of AIA, and "acted fraudulently, vexatiously, or otherwise not in good faith with respect to the Plaintiff." (Dkt. 1, Ex. B ¶¶ 523–533.)

Also on February 19, 2019, the state court granted the Plaintiff's emergency motion to expand the original TRO, mandating that the Debtor reinstate all of the Plaintiff's insurance policies that he had cancelled, requiring him to return all property removed from the lease space, and preventing him from entering into another lease on behalf of TEAM or moving TEAM's operations from the leased premises. (Dkt. 30, Exs. J & L; Dkt. 45 ¶ 40.) According to the TRO, "[t]he status quo as to TEAM's operations prior to October 23, 2018" was to "remain in full force and effect." (Dkt. 30, Ex. J; *see also* Dkt. 45 ¶ 40.)

Notwithstanding the directives in the expanded TRO, the parties were unable to work together, and the state court determined that it could not create suitable procedures for the continued operation of the company by the Plaintiff and the Debtor. (Dkt. 11 ¶ 72.) Thus, on March 26, 2019, the court appointed a receiver to manage TEAM's daily operations. (*Id.*; Dkt. 30, Ex. 1 to Ex. M.) About three months later, the Debtor filed two motions to dissolve TEAM, one on July 2, 2019 and another on August 5, 2019. (Dkt. 30, Exs. M & N.) According to the Debtor's motions, the closure of TEAM was "inevitable" based on the revenues, collections, and

7

disbursements, as well as the forecasted negative cash flow, reflected in the receiver's reports. (*Id.*, Ex. M ¶ 19, Ex. N ¶ 8; *see also* Dkt. 45 ¶ 42.)

Despite the state of affairs at TEAM, the court did not grant the Debtor's motions to dissolve the company. (Dkt. 11 ¶ 74; Tr. at 58:20–22.) Rather, on August 30, 2019, based on the representations of both the Debtor and the receiver, the court ordered the layoff of TEAM employees, effective September 3, 2019, and authorized the receiver to wind down the business. (Dkt. 30, Ex. O; Ex. 45 ¶ 43.)

On September 3, 2019, the date on which TEAM employees were laid off, the Debtor told them about employment opportunities that would be available at a new company that was being created. (Dkt. 45 ¶ 45; Tr. at 143:12–22, 144:21–145:2.) That company was Chicago Aviation Services, LLC ("CAS"), an aircraft maintenance business registered with the State of Illinois on September 9, 2019, which provides primarily the same services that TEAM did. (Dkt. 45 ¶¶ 46, 47.) CAS was established under the name of Robert Siracusano, a former TEAM customer, just days after Siracusano had met with the Debtor and TEAM's office manager Leigh Brunelle to discuss the possibility of launching an aviation maintenance company. (*Id.* ¶ 48; Tr. at 346:15–17, 380:21–383:9, 414:8–22.) At that meeting, which took place on September 2, 2019, the Debtor and Brunelle provided Siracusano with information about TEAM's vendors, revenue, and income, as well as other financial details. (Dkt. 45 ¶ 49; Tr. at 112:3–18, 380:21–384:10.**)**

Although CAS was established under Siracusano's name and Siracusano testified that Brunelle had "set up the whole thing," the Debtor admits that he was unequivocally involved in the company's formation, at a time when he was still the president of TEAM. (Dkt. 45 ¶¶ 50–53;

Tr. at 463:12–20.) Indeed, Brunelle testified that, as CAS was being formed, the Debtor acted as an intermediary between her and Siracusano to provide the information needed to get the company up and going. (Dkt. 45 ¶ 52; Tr. at 428:4–429:22, 436:11–22.)

After the state court ordered the layoff of TEAM's employees, all but two were immediately hired by CAS.[9] (Dkt. 45 ¶ 68; Tr. at 45:15–21, 132:21–24, 330:24–331:6.) Among the new CAS employees, the Debtor was hired as the company's general manager, who was tasked with, among other things, managing the mechanics for CAS. (Dkt. 45 ¶ 54; Tr. at 62:13–18, 502:18–24.) Within four weeks of its formation, CAS already had fifty-nine customers; of those, fifty-four were former TEAM customers, many of which the Debtor himself had directed to the new company. (Dkt. 1, Ex. F at 9:16–22; Dkt. 45 ¶ 58, 65; Tr. at 371:16–372:1.)

On September 3, 2019, the Debtor told a business contact at Cirrus, an aircraft manufacturing company, that TEAM could no longer service any Cirrus aircraft because all of TEAM's employees had been laid off but that a new company would be able to provide the same services. (Dkt. 45 ¶ 62; Tr. at 150:4–152:19.) Within a few weeks of that conversation, CAS was approved as an "Authorized Service Center" ("ASC"), a designation required to perform work on Cirrus aircraft, because, according to the notes in a Cirrus salesforce document, TEAM was now operating as CAS. (Dkt. 45 ¶¶ 61, 63.) Specifically, the notes provided: "Prior partner TEAM Aviation. The entire employee group from Travel Express Aviation (TEAM) in Chicago has

---

[9] The Plaintiff was one of the employees who was not hired by the new company; the other moved out of town but apparently was listed as an independent contractor for CAS. (Dkt. 45 ¶ 68; Dkt. 36 at 20.)

moved two hangars down and is now Chicago Aviation Services, LLC."[10] (*Id.* ¶ 63; Dkt. 30, Ex. I-25.)

On September 18, 2019, nine days after CAS had been established, the Plaintiff filed his Share Purchase Motion pursuant to § 12.56 of the IBCA, seeking a buyout of his shares in TEAM, as well as legal fees and costs, as a result of the Debtor's alleged fraud and breach of fiduciary duty. (Dkt. 1, Ex. D-1.) Two months later, on November 13, 14, and 15, 2019, the state court conducted a three-day evidentiary hearing on the Motion, during which the Debtor, the Plaintiff, and four other witnesses testified and ninety-six exhibits were admitted into the trial record, as well as numerous exhibits attached to various evidence depositions.[11] (Dkt. 45 ¶¶ 15, 16.)

On December 13, 2019, the state court ruled on the Share Purchase Motion, ordering the Debtor to buy the Plaintiff's shares in TEAM for their value as of August 31, 2019. (Dkt. 1, Ex. F.) In reaching its decision, the court found that the Debtor breached his fiduciary duty to the Plaintiff and TEAM and that his actions were "deceptive, oppressive, and fraudulent" with respect to the Plaintiff and TEAM under subsections (1), (3), and (4) of § 12.56(a) of the IBCA.[12] To provide context for and elaborate on its ruling, the court stated as follows:

---

[10] Cirrus's notes reflect that TEAM's status as an ASC was terminated on September 19, 2019, with its "Relationship Type" designated as "Former Authorized Service Center." (Dkt. 30, Ex. I-24; Tr. at 268:14–269:9.) CAS became a Cirrus ASC just five days later, on September 24, 2019. (Dkt. 30, Ex. I-25; Tr. at 279:1–16.)

[11] The state court judge reviewed the testimony in eleven video depositions, as well as the testimony in five deposition transcripts, all of which are part of the state court record. (Dkt. 1, Ex. F at 5:2–6:19.)

[12] Those provisions state as follows:

> (a) In an action by a shareholder in a corporation that has no shares listed on a national securities exchange or regularly traded in a market maintained by one or more members of a national or affiliated securities association, the Circuit Court may order one or more of the remedies listed in subsection (b) if it is established that:

It is clear from the conclusion of the evidence that this Court heard, as well as the exhibits, that [the Debtor] breached his fiduciary duty. Working for CAS, directing TEAM clients to CAS, and this Court is convinced that CAS does not become an entity without [the Debtor]. And he does all of this while he still owes a fiduciary duty to TEAM and to [the Plaintiff].

The Court is convinced beyond all doubt that CAS is basically the new TEAM. None of the employees of TEAM except [the Debtor], . . . who are now at CAS, are at fault with respect to this Court's ruling.

* * *

The Court also believes that it is clear that [the Debtor] set up CAS and that his past relationship with Mr. Siracusano le[d] Mr. Siracusano to become the "owner" of CAS, but CAS is servicing 98 percent of TEAM's clients. All but two employees of TEAM are now employees of CAS.

This new business is basically the same business a TEAM.

* * *

Generally when . . . 50/50 shareholders [are] having a dispute . . . , it is worked out by the owners because really the only other alternative[ ] . . . is that some other entity comes in and buys the business at a discount or there is a destruction of the business.

But the fiduciary duties owed by 50/50 owners or any owners or directors or officers of a company, those don't just disappear until that company is properly dissolved, sold, or some other . . . proper dissipation of that company.

---

(1) The directors are deadlocked . . . in the management of the corporate affairs; the shareholders are unable to break the deadlock; and either irreparable injury to the corporation is thereby caused or threatened or the business of the corporation can no longer be conducted to the general advantage of the shareholders; or

* * *

(3) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder whether in his or her capacity as a shareholder, director, or officer; or

(4) The corporation assets are being misapplied or wasted.

805 ILCS 5/12.56(a)(1), (3), (4).

This is the first time I have seen one 50 percent owner/officer/director sink a business like what has happened here.

* * *

CAS formed at least within a few days of this Court's order of a temporary layoff of employees[.] . . . [T]he Court is not putting any blame on TEAM employees that were laid off except for [the Debtor]. The problem here is that [the Debtor] was still an officer/director of TEAM, and, as noted, all but two TEAM employees are now working or went to work for CAS and 98 percent of TEAM's customers are now customers of CAS.

It is clear to this Court that this was [the Debtor's] plan from a certain point. I can't be exactly sure, but it was well before the Court order . . . temporarily laying off TEAM's employees.

The Court is convinced that [the Debtor] saw an opportunity to abandon TEAM as it was sinking and to use Mr. Siracusano . . . to create a new business. . . . I think Mr. Siracusano saw the opportunity presented to him by [the Debtor] to create this new business.

The Court is not [faulting] Mr. Siracusano because he made a business decision. . . . He did nothing improper. . . . [T]he fault in this situation lies with [the Debtor] . . . because he still owed [fiduciary] duties to TEAM. It is clear to this Court and the Court is convinced that he breached his fiduciary duties to TEAM.

The Court also believes that there was an improper pattern of conduct by [the Debtor] that has led us to this point.

* * *

This Court also believes that [the Debtor's] actions in seeking dissolution of TEAM were deceptive to this Court and his actions also violated the TRO that had been entered in this case back in October of 2018.

The creation and the existence of CAS [are] clearly the culmination of a plan that had been thought of or put into effect well before this Court's August 30, 2019 court order which ordered the layoff effective September 3rd of 2019.

(Dkt. 1, Ex. F at 9:16–14:9.)

12

Subsequent to this ruling, the state court conducted other proceedings on various related matters. On February 25, 2020, the court held an evidentiary hearing on the valuation of TEAM as of August 31, 2019, during which three expert witnesses testified as to that value. (Dkt. 45 ¶¶ 13, 15; Dkt. 11 ¶ 92; *see also* Dkt. 1, Ex. G at 14:2–15:13.) Subsequently, on March 10, 2020, the court determined that the value of TEAM for purposes of the share purchase under § 12.56 of the IBCA was $800,000 and that, correspondingly, the value of the Plaintiff's shares in the company was $400,000.[13] (Dkt. 1, Ex. G at 15:14–17:2; Dkt. 45 ¶ 85.) The court also awarded the Plaintiff his attorneys' fees and costs pursuant to §§ 12.56 and 12.60 of the IBCA.[14] (Dkt. 1, Ex. G at 7:14–8:7, 8:20–10:5; Dkt. 45 ¶ 11.) In support of the fee award, the court reiterated the findings from its ruling on the Share Purchase Motion, explaining, among other things, that the Debtor's "pattern of conduct" was "improper," that his motions to dissolve TEAM were deceptive to the court, and that the creation and existence of CAS were the "culmination of a plan that had been thought of or put into effect well before" the court's order laying off TEAM's employees. (Dkt. 1, Ex. G at 10:6–11:10; Dkt. 45 ¶¶ 77–82.)

On June 1, 2020, the state court entered a final and appealable order in favor of the Plaintiff and against the Debtor based on the findings in its ruling on the Share Purchase Motion. (Dkt. 1, Ex. H; Dkt. 45 ¶ 10.) Specifically, the court ordered the Debtor to purchase all of the

---

[13] Subsection (e) of § 12.56 of the IBCA provides, among other things, that if the court orders a share purchase, it "shall . . . [d]etermine the fair value of the shares, . . . taking into account any impact on the value of the shares resulting from the actions giving rise to a petition under this Section"; "[c]onsider any financial or legal constraints on the ability of the . . purchasing shareholder to purchase the shares"; and "[s]pecify the terms of the purchase, including, if appropriate, terms for installment payments" and "interest at the rate and from the date determined by the court to be equitable." 805 ILCS 5/12.56(e)(i)–(iii).

[14] Section 12.56(b)(10) provides that "[t]he relief which the court may order in an action" under § 12.56 includes "[t]he award of damages to any aggrieved party." 805 ILCS 5/12.56(b)(10). Section 12.60(j) provides in turn that "[i]f the court finds that a party to any proceeding under Section . . . 12.56 acted arbitrarily, vexatiously, or otherwise not in good faith, it may award one or more other parties their reasonable expenses, including counsel fees . . . , incurred in the proceeding." 805 ILCS 5/12.60(j).

Plaintiff's shares in TEAM for a total price of $400,000 and awarded the Plaintiff attorneys' fees and costs in the amount of $371,470.84. (Dkt. 1, Ex. H ¶ 1; Dkt. 45 ¶¶ 86, 87.)

On June 18, 2020, the state court granted in part the Plaintiff's motion for prejudgment interest, awarding interest at the rate of 5% per year on the award of $400,000, beginning September 18, 2019—the date of the filing of the Share Purchase Motion—through the date of judgment. (Dkt. 1, Ex. I at 5:9–23, Ex. J ¶ 1; Dkt. 45 ¶¶ 12, 88.)

Shortly thereafter, on July 1, 2020, the Debtor and his wife filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, which tolled the deadline to appeal the state court judgment. (Bankr. No. 20 B 13380, Dkt. 1; *see also* Dkt. 36 at 5.) About three months later, on September 25, 2020, the Plaintiff filed an adversary complaint against the Debtor, seeking a determination that the state court judgment on the Share Purchase Motion is excepted from discharge pursuant to §§ 523(a)(2)(A), (a)(4), and (a)(6). (Dkt. 1.) The Debtor filed an answer to the complaint on November 23, 2020. (Dkt. 11.) On January 22, 2021, the Court entered an order modifying the automatic stay in connection with the Debtor's pursuit of the state court appeal to allow the thirty-day appeal period to run. (Bankr. No. 20 B 13380, Dkt. 45.) After the automatic stay had been modified, the Debtor did not file an appeal of the state court's judgment against him. (Dkt. 11 ¶ 101.)

Subsequently, on August 2, 2021, the Plaintiff filed the instant motion for summary judgment on all six counts of the complaint. (Dkt. 19.) On September 17, 2021, he voluntarily dismissed with prejudice the derivative claims asserted by TEAM against the Debtor in Counts II, IV, and VI. (Dkt. 37.) The claims asserted by the Plaintiff against the Debtor in Counts I, III,

14

and V remain. The motion for summary judgment as to those claims has been fully briefed and is now ready for ruling.

## SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7056). The primary purpose of the summary judgment procedure is to avoid unnecessary trials where no material facts are in dispute. *See Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir. 1990); *Farries v. Stanadyne/Chi. Div.*, 832 F.2d 374, 378 (7th Cir. 1987) (quoting *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir. 1986)). Thus, on a motion for summary judgment, the court must decide, based on the evidence, whether there is a material disputed fact that requires a trial. *Gupta v. Melloh*, 19 F.4th 990, 996–97 (7th Cir. 2021). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the material facts are not in dispute, the only issue is whether the moving party is entitled to judgment as a matter of law. *ANR Advance Transp. Co. v. Int'l Brotherhood of Teamsters, Loc. 710*, 153 F.3d 774, 777 (7th Cir. 1998).

### 1. Standards

The party seeking summary judgment always bears the burden of establishing that there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the movant has met his burden, the court must view all reasonable inferences drawn from the underlying facts in a light most favorable to the

15

nonmoving party. *Anderson*, 477 U.S. at 248; *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 928 (7th Cir. 2020). Once the moving party satisfies his initial burden of production, the party opposing the motion may not rest on the mere allegations or denials in his pleadings; rather, his response must set forth specific facts demonstrating that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

All factual assertions made in a summary judgment motion must be supported by citations to particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, and other materials. Fed. R. Civ. P. 56(c)(1)(A); L.R. 7056-1(B). Likewise, a party asserting that a fact is genuinely disputed must support that assertion with citations to the record. Fed. R. Civ. P. 56(c)(1)(A); L.R. 7056-2(A)(2)(a); *Ortega v. United States*, No. 16-cv-8402, 2021 WL 4477896, at *2 (N.D. Ill. Sept. 30, 2021). Facts that are denied without evidentiary support for the denials are deemed admitted. L.R. 7056-2(B) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Maxwell v. Penn Media (In re marchFirst, Inc.)*, Bankr. No. 01 B 24742, Adv. No. 03 A 1141, 2010 WL 4027723, at *2 (Bankr. N.D. Ill. Oct. 14, 2010); *see also Williams v. City of Chi. Bd. of Educ.,* No. 10 C 7105, 2012 WL 3023313, at *4 (N.D. Ill. July 24, 2012) ("[T]o the extent that any of [a party's] denials do not contain a citation to the record or the citation does not support the denial, those statements of fact . . . [are] deemed admitted.").

16

A party may object to supporting material in a summary judgment motion on the basis that such material cannot be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). When ruling on such objections, courts focus not on the admissibility of the evidence's form, but on the admissibility of its contents. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). For example, although a document itself might be inadmissible at trial, its contents may be admitted through direct testimony or to refresh a witness's recollection. *See, e.g., Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (concluding that the contents of a diary could be considered because they could be presented in an admissible form at trial).

Federal Rule of Civil Procedure 56 has been described as "an enlarging provision as to what may be considered, not a restriction." *Yong Hong Keung v. Dulles*, 127 F. Supp. 252, 252 (D. Mass. 1954). Thus, objections to the admissibility of evidence may be overruled at the summary judgment stage as long as the court is satisfied that the contents of the evidence could be presented in admissible form at trial. *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010); *see, e.g., Lishamer v. Wal-Mart Stores, Inc.*, No. 15 C 6159, 2018 WL 620037, at *1 n.1 (N.D. Ill. Jan. 30, 2018) (summarily overruling the defendant's evidentiary objections because the "plaintiff [would] likely . . . be able to cure [the] problems at trial").

### 2. The Parties' Statements and Responses

The factual background in this matter is made more complicated and muddied by the Debtor's failure to comply with Local Rule 7056. Of the eighty-eight paragraphs in the Plaintiff's statement of facts, the Debtor denies all or part of the factual assertions in only nine of them. (Dkt. 45 ¶¶ 19, 20, 25, 26, 33, 41, 42, 45, 49.) In all instances but one, however, the Debtor fails to cite any record support for the denials. (*See id.* ¶ 42.) The paragraphs for which the

17

Debtor has provided no evidentiary support are deemed admitted for purposes of summary judgment. L.R. 7056-2(B). Additionally, the Debtor neither admits nor denies the assertions in ten of the Plaintiff's statements and provides no response at all to the assertion in one of them. (*Id.* ¶¶ 35, 38, 39, 44, 50, 53, 55–58.) Those statements are also admitted. L.R. 7056-2(B); *marchFirst*, 2010 WL 4027723, at *2 (explaining that "[f]acts to which a party offers some coy or clever response that is neither a direct admission nor a denial are admitted").

For most of the responses in which the Debtor does not admit or deny the Plaintiff's statements, he instead provides additional information in an apparent attempt to offer an explanation. (Dkt. 45 ¶¶ 35, 38, 39, 44, 50, 55.) Similarly, although the Debtor admits the assertions in many of the paragraphs in the Plaintiff's statement of facts, he then proceeds to advance arguments and/or offer supplemental information in some of his responses, seemingly in an effort to clarify or condition them. (*Id.* ¶¶ 13, 14, 28, 36, 37, 43.) By "improperly placing standalone assertions" in his responses, rather than including them in his separate statement of additional facts pursuant to Local Rule 7056-2(A)(2)(b), the Debtor deprives the Plaintiff of the opportunity to either admit or deny the new assertions, thus defeating the purpose of Rule 7056. *See Ortega*, 2021 WL 4477896, at *3. In its discretion, the Court refuses to consider any of these new facts in ruling on the instant motion for summary judgment, *see Eason v. Nolan,* 416 F. App'x 569, 569 (7th Cir. 2011), particularly in light of the fact that none of them are supported by accurate citations to the record.

In addition to the deficiencies in the Debtor's responses to the Plaintiff's statement of facts, there are various problems with the Debtor's statement of additional facts. First, in the two initial paragraphs, the Debtor asserts that he "incorporates his responses to [the] Plaintiff's

amended statement of facts as though fully set forth herein" and that "[a]s part of this statement [of additional facts], [the Debtor] attaches hereto his declaration as Exhibit 'A.'" (Dkt. 46 ¶¶ 1, 2.) These are not proper statements of fact for purposes of a motion for summary judgment.

Second, at least one of the assertions in the Debtor's statement of additional facts is contradicted by the evidence of record. Specifically, in paragraph 5, the Debtor states that "[a]t no time during [his] tenure as general manager of TEAM did [he] ever deny [the Plaintiff] access to the books and records of TEAM." (*Id.* ¶ 5.) The state court record and the parties' statements and responses, however, establish that the Debtor exerted full control and authority over the company's financial books and records and that the Plaintiff was unable to gain access to them, particularly after he filed the state court complaint against the Debtor. In an email message dated December 7, 2018, for example, the Debtor addressed the Plaintiff's concerns about the continued employment of James Clohessy as TEAM's CPA by stating that "the decision to continue to use Clohessy . . . will not be reconsidered and you will not be given live access to business accounts and information. *You never sought[ ] nor had such access prior to your lawsuit and there is no reason to allow for it now*." (Dkt. 1, Ex. B, Ex. 40 (emphasis added).)

Third, the Debtor provides no evidentiary support for some of the assertions in his statement of additional facts. (Dkt. 46 ¶¶ 3–5.) For the others, he relies primarily on the receiver's reports and his own "Declaration" executed on November 5, 2021. (*Id.* ¶¶ 6–11.) The Plaintiff, however, denies those assertions and includes citations to the record, as well as various explanations, in support of his denials. (Dkt. 50 ¶¶ 6–11.) In any event, as discussed *infra*, the Debtor's additional facts are of no consequence in the context of collateral estoppel, given the

19

state court's judgment in favor of the Plaintiff and against the Debtor on the Share Purchase

Motion.

### 3. The Parties' Evidentiary Objections

Before addressing the merits of the parties' arguments, the Court considers the

evidentiary objections that they have raised. Specifically, the Debtor objects to three of the

eighty-eight paragraphs in the Plaintiff's statement of facts, and the Plaintiff objects to all of the

eleven paragraphs in the Debtor's statement of additional facts.

The Debtor first objects to paragraph 16 in the Plaintiff's statement of facts, which asserts

as follows:

> There were 154 trial exhibits, and of those trial exhibits, 100 were
> introduced and 96 were admitted into the trial record. *See* [Plaintiff's]
> Evidentiary Hearing Exhibit List attached hereto as Exhibit I; *see also* all
> Trial Exhibits attached hereto as Exhibit[s] I-1–I-154. In addition to the
> 100 exhibits introduced at trial, there were numerous exhibits attached to
> evidence depositions that the [state] [c]ourt admitted into the trial record.
> In addition to all of the evidence depositions and their respective exhibits
> that were admitted into the trial record, there were also four evidence
> depositions of witnesses that were not admitted to the trial record because
> those witnesses later gave testimony at trial. Moreover, there were
> thousands of pages of other documents obtained in discovery that were not
> introduced at trial due to time constraints, but were consistent with the
> findings of the [state] [c]ourt.

(Dkt. 30 ¶ 16.) In response to this paragraph, the Debtor "objects to the admission of any Exhibit

I, as the [state] [c]ourt's ruling does not indicate which exhibits were admitted and makes no

specific reference to any of the exhibits." (Dkt. 45 ¶ 16.)

The Debtor's objection to paragraph 16 is overruled. In that paragraph, the Plaintiff is not

seeking admission of any of the documents within Exhibit I. Rather, he is simply describing the

exhibits that were introduced and admitted into the state court trial record. As discussed *supra*, in

deciding whether a debt is nondischargeable, the bankruptcy court may consider both the judgment and the entire record of the prior suit, including exhibits from that previous proceeding. *Brown v. Felsen,* 442 U.S. 127, 127–28, 138–39 (1979); *see also USLife Title Ins. Co. v. Dohm (In re Dohm)*, 19 B.R. 132, 133 (Bankr. N.D. Ill. 1981), *aff'd*, 19 B.R. 134 (N.D. Ill. 1982). As such, in making its nondischargeability determination here, the Court has reviewed the full record of the prior state court proceedings.[12]

The Debtor's two other objections are grounded in hearsay. In the first, the Debtor objects to paragraph 64, which provides as follows:

> CAS was approved [as a Cirrus ASC] under the impression that TEAM was now CAS[,] which is further evidenced by the fact that Cirrus's records for CAS included work done from November 14, 2018, despite the fact that CAS was not formed until September 9, 2019. *See* Ex. I-25. A key TEAM employee mechanic described Cirrus's transition from TEAM to CAS . . . as "seamless." *See* Ex. G-13 at 81:12–14.

(Dkt. 30 ¶ 64.) It is unclear whether the Debtor's response—"Objects to the statement as hearsay"—refers to the entire paragraph or only to the comment made by the TEAM employee mechanic (Mark Palazzo). In either case, the objection is overruled. Exhibit I-25 was admitted in the prior proceeding, and the state court judge reviewed the video deposition testimony of the mechanic (in Exhibit G-13) in reaching his decision. (*See* Tr. at 163; Dkt. 1, Ex. F at 4:23–5:6.) This Court is satisfied that the content of those materials could be presented in an admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2).

The Debtor's second objection based on hearsay is to paragraph 66, which refers to the fact admitted by the Debtor that CAS had generated fifty-nine customers, fifty-four of which were former TEAM customers, within four weeks of its formation. (*See* Dkt. 45 ¶ 65.) The

---

[12] The state court record includes the transcript from the three-day evidentiary hearing on the Share Purchase Motion, and that transcript indicates which exhibits were admitted. (*See* Dkt. 1, Ex. E.)

Plaintiff asserts in paragraph 66 that "[t]his fact was echoed by Matthew [Kaseeska], President of Net Works Consulting Resources, Inc., the IT support provider of TEAM and CAS, who offered a PowerPoint presentation to CAS in which he noted, '[CAS] is a new start-up in a unique situation as it has a preexisting book of business.' Ex. H-2 at 171:22–24." (Dkt. 30 ¶ 66.)

At trial, Kaseeska testified that the PowerPoint presentation at issue was prepared not by him but by his "technical lead" employee. (Tr. at 170:18–171:15, 178:8–10.) According to the testimony, that employee told Kaseeska that he included the language about CAS being a new start-up with "a preexisting book of business" based on an "assumption" that clients would "follow" CAS as it "split" from TEAM. (Tr. 172:2–10, 177:16–178:3, 183:23–184:2; *see also id.* at 181:13–15.) Because the PowerPoint slide was created by Kaseeska's employee who used language in the slide based on an assumption, the Court is not satisfied that the content of the materials could be presented in an admissible form at trial. Accordingly, the Debtor's objection to paragraph 66 is sustained.

Finally, the Plaintiff objects to all eleven paragraphs in the Debtor's statement of additional facts, sometimes for more than one reason per paragraph. According to the Plaintiff, two paragraphs are not proper statements of fact, two other paragraphs contain multiple statements of fact, and all paragraphs but the first are irrelevant to the motion for summary judgment. (Dkt. 50 ¶¶ 1–11.) Thus, the Plaintiff asks the Court to strike all of the paragraphs in the Debtor's statement of additional facts.

As discussed *supra*, the Plaintiff's objections to the first two paragraphs are sustained because the statements in those paragraphs are improper for purposes of summary judgment. The Plaintiff's objections to the other paragraphs based on relevancy, however, are without merit.

The statements in paragraphs 3 and 4, for example, provide material background information, and the statement in paragraph 5 goes to whether there was a disparity in knowledge or power between the parties. Therefore, although the facts in those paragraphs are not admitted because the Debtor failed to provide evidentiary support for them, they are certainly relevant to the motion for summary judgment. Similarly, the statements in paragraphs 6 through 11 address the sufficiency of TEAM's revenues to sustain operations and the formation of CAS in order to both provide jobs to TEAM's laid off employees and service TEAM's former customers. Thus, those paragraphs are also relevant to the instant summary judgment motion. Accordingly, the Plaintiff's objections to paragraphs 3 through 11 on the ground of relevancy are overruled.

After the procedural and evidentiary dust has settled, a careful review of the parties' statements and responses reveals that there are no genuine issues of material fact in dispute. Thus, the only question to be considered is whether the Plaintiff is entitled to judgment as a matter of law.

## JURISDICTION

Before turning to the parties' substantive arguments in this matter, the Court addresses the Plaintiff's assertion that the *Rooker-Feldman* doctrine precludes the Court from reviewing, overturning, modifying, or otherwise rejecting the judgment entered against the Debtor in the state court. That doctrine prevents lower federal courts from exercising jurisdiction over cases "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the [federal] court proceedings commenced and inviting [federal] court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). "The rational for the doctrine is that no matter how wrong a state court judgment may be

under federal law, only the Supreme Court of the United States has jurisdiction to review it."
*Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*, 837 F.3d 736, 742 (7th Cir. 2016).

Here, the Plaintiff contends that the Debtor denies in his answer to the adversary complaint some of the facts that were already established by the state court. To the extent that the Debtor is seeking to have this Court overturn the state court's findings of fact, the Plaintiff argues that the *Rooker-Feldman* doctrine precludes the Court from doing so.

Specifically, among the "discrepancies" between the Debtor's answers and the factual findings made by the state court, the Plaintiff contends that in paragraph 23 of the answer, the Debtor denies that AIA used TEAM's funds and assets (Dkt. 11 ¶ 23), even though he testified during his previous deposition that TEAM's assets were used to establish AIA and admitted that the initial TRO was entered in connection with AIA (Dkt. 30, Ex. G-2 at 24:15–18, 26:8–20; *see also* Dkt. 45 ¶¶ 28, 32). It is well established that "[a] party may not create a *genuine* issue of fact by contradicting his own earlier statements, at least without a plausible explanation for the sudden change of heart." *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir. 1988). Because the Debtor's answer to paragraph 23 of the complaint contradicts his prior deposition testimony without providing a reason for the inconsistency, the Debtor's answer does not create a genuine issue of material fact.

The Plaintiff also points to the Debtor's answer to paragraph 81 of the complaint, in which he "[d]enies that he established CAS." (Dkt. 11 ¶ 81.) This denial, the Plaintiff says, contradicts the state court's findings that the Debtor "set up CAS" and that "CAS does not become an entity without [the Debtor]." (Dkt. 1, Ex. F at 9:20–21, 10:20–21.) Looking closer at the answer to paragraph 81, however, the Court notes that the Debtor, as he is wont to do,

24

provides additional information, seemingly to clarify his answer. With that information, the answer suggests that the Debtor denies that he established CAS insomuch as he did not have an "ownership interest in CAS." (*See* Dkt. 11 ¶ 81.) Such a reading of the answer does not conflict with the state court's findings.

Notwithstanding resolution of these and other inconsistencies in his favor, the Plaintiff argues that such discrepancies "raise concerns" for him in seeking a determination that the debt at issue is nondischargeable (Dkt. 36 at 8) and urges the Court to find that the *Rooker-Feldman* doctrine applies to bar the Court from revisiting or modifying the state court's findings of fact. The Plaintiff's argument is meritorious but irrelevant here. The Court is not being called upon to review the state court's findings and need not overturn, modify, or reject them in order to determine the interests of the parties. *See Zurich Am. Ins. Co. v. Super. Ct. of Cal.*, 326 F.3d 816, 823 (7th Cir. 2003) (explaining that the key question in every *Rooker-Feldman* analysis is whether the federal court "is in essence being called upon to review the state-court [decision]" (internal quotations omitted)); *Epps v. Credinet, Inc.*, 320 F.3d 756, 759 (7th Cir. 2003) (noting that if "success in the federal court would require overturning the state court decision," then the federal court lacks jurisdiction over the claim); *see also Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999) (clarifying that the remedy for a party seeking review of a state court decision is the pursuit of a state court appeal). Rather, the Court must decide only whether the state court's findings are sufficient to except that judgment from discharge in bankruptcy.

Accordingly, the Court has jurisdiction to determine the interests of the parties in this matter. That jurisdiction is conferred by 28 U.S.C. § 1334 and Internal Operating Procedure

15(a) of the United States District Court for the Northern District of Illinois. The matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## DISCUSSION

In his motion for summary judgment, the Plaintiff contends that he is entitled to judgment as a matter of law through the application of collateral estoppel. Under that doctrine, the Plaintiff argues, the Debtor is precluded from re-litigating the factual issues decided by the state court and those facts establish, as a matter of law, that the debt at issue is nondischargeable pursuant to §§ 523(a)(2)(A), (a)(4), and (a)(6). In response, the Debtor argues that the state court did not establish all of the elements necessary for nondischargeability and that material issues of fact remain regarding those elements. As such, the Debtor urges the Court to deny the Plaintiff's motion for summary judgment and argues that the parties should proceed to trial.

### 1. Collateral Estoppel

Bankruptcy courts generally make independent decisions as to whether debts are nondischargeable under the various provisions of § 523(a). *See Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994). It is well established, however, that the doctrine of collateral estoppel, or issue preclusion, applies in bankruptcy discharge exception proceedings. *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991); *Klingman v. Levinson*, 831 F.2d 1292, 1294–95 (7th Cir. 1987). Accordingly, "if a court of competent jurisdiction has previously entered judgment against [a] debtor," collateral estoppel may bar the debtor from re-litigating "the underlying facts in the bankruptcy court." *Meyer*, 36 F.3d at 1378. Indeed, a bankruptcy court may conclude that a debt is nondischargeable based *solely* on the evidence of a prior proceeding, as long as the judgment in that proceeding was obtained fairly, the defendant was accorded due process, the complaint

26

and judgment order are unambiguous that the judgment debt is "of a non-dischargeable nature," and the record from the prior proceeding is before the bankruptcy court. *U.S. Life Title Ins. Co. of N.Y. v. Wade (In re Wade)*, 26 B.R. 477, 481 (Bankr. N.D. Ill. 1983). By precluding the re-litigation of the same factual issues between the same parties, collateral estoppel preserves judicial resources, lessens the cost and vexation of multiple lawsuits, and prevents the issuance of inconsistent decisions. *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Sylvester v. Martin (In re Martin)*, 130 B.R. 930, 942 (Bankr. N.D. Ill. 1991).

Where a prior judgment was issued by a state court, the collateral estoppel of that state governs. *Gambino v. Koonce*, 757 F.3d 604, 608 (7th Cir. 2014). Because the judgment against the Debtor was entered in an Illinois state court, the Illinois law of collateral estoppel applies. The elements of collateral estoppel under Illinois law are as follows: (1) a prior case presented an identical issue; (2) the case ended in a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party in the prior case. *Id.*; *Wians v. Wians (In re Wians)*, 523 B.R. 124, 129 (Bankr. N.D. Ill. 2014).

Only the first element is in dispute in this matter. The Plaintiff argues that the issues at bar are "identical" to those in the state court proceedings for purposes of collateral estoppel because the state court's findings satisfy the elements required for nondischargeability under §§ 523(a)(2)(A), (a)(4), and (a)(6). The Debtor disagrees. Faulting the Court's analysis in *Thazhathuputhenpurac v. Abraham (In re Abraham)*, 582 B.R. 202 (Bankr. N.D. Ill. 2018), in which collateral estoppel was applied to preclude the debtor from re-litigating the factual issues decided by the state court under the IBCA, the Debtor argues that the elements needed to prevail under that statute are not identical to and require less exacting proof than those under the

27

exceptions to discharge invoked by the Plaintiff. Specifically, the Debtor argues, breach of fiduciary duty under the IBCA is a form of constructive fraud, which does not require proof of direct intent to harm.

Under Illinois law, a presumption of constructive fraud arises when there is a breach of fiduciary duty. *Duffy v. Orlan Brook Condo Owners' Ass'n*, 981 N.E.2d 1069, 1078 (Ill. App. Ct. 2012). Constructive fraud includes any act, statement, or omission that is "construed as a fraud by the courts because of its detrimental effect upon public interests and public or private confidence." *Sale v. Allstate Ins. Co.*, 467 N.E.2d 1023, 1034 (Ill. App. Ct. 1984); *see also Small v. Sussman*, 713 N.E.2d 1216, 1222 (Ill. App. Ct. 1999). As the Debtor notes, "[a] claim for constructive fraud does not require proof of actual dishonestly or intent to deceive; it involves the breach of a legal or equitable duty that the law declares to be fraudulent, regardless of the moral guilt of the wrongdoer, because of its tendency to deceive others." *Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 809 (Ill. App. Ct. 1998).

Although proof of intent is not required to prevail on a claim for breach of fiduciary duty under Illinois law, the Debtor's argument is unavailing, because the state court's findings were not limited to those in connection with the Debtor's breach of his fiduciary duty. Rather, under § 12.56 of the IBCA, the state court also examined, among other things, whether the Debtor acted "in a manner that [was] illegal, oppressive, or fraudulent with respect to" the Plaintiff and whether the "corporation assets [were] being misapplied or wasted." *See* 805 ILCS 5/12.56(a)(3) & (4). The issues to be determined under §§ 523(a)(2)(A), (a)(4), and (a)(6) are whether the Plaintiff acted fraudulently or otherwise improperly in connection with the use of TEAM assets and the establishment of CAS from which the judgment debt arose and whether he committed

28

fraud or defalcation while acting in a fiduciary capacity. As in *Abraham*, the inquiry decided by the state court under § 12.56 of the IBCA mirrors the current inquiry before this Court under the applicable provisions of § 523. Thus, the Court finds that the issues sought to be precluded in this matter are the same as those that came before the state court for purposes of collateral estoppel. Accordingly, the "identical issue" element required under the doctrine is satisfied.

Notwithstanding this conclusion, the Debtor offers other arguments in support of his position that collateral estoppel cannot be applied here. First, he contends that application of the doctrine to this matter is improper based on the adequacy and nature of the facts in the state court's ruling, as well as the form of that ruling. According to the Debtor, collateral estoppel is not applicable because the state court's factual findings were both "insufficient" and imprecise. (Dkt. 47 at 5.) In particular, the Debtor claims that nowhere in its ruling did the state court find that he acted with "a specific intention to harm" the Plaintiff. (*Id.* at 6.) The Debtor also argues that the problem of applying collateral estoppel is compounded by the fact that the state court did not "issue any written opinion whatsoever." (*Id.* at 5.) The Debtor's arguments are without merit.

As discussed extensively below, the state court ruling sets forth sufficient facts— including those in connection with the Debtor's intent—for purposes of a nondischargeability determination. Although the state court did not expressly use the language "intention to harm" in its ruling, the court in a prior action need not use the specific words or phrases found in the elements of a statutory exception to discharge in order for collateral estoppel to apply.[13] As long as that court's findings of fact, when viewed in the aggregate, "independently comprise elements

---

[13] Conditioning the application of collateral estoppel on the prior court's use of the express words in the bankruptcy nondischargeability statutes would require that court to *anticipate* that a losing party might file for bankruptcy. Such a requirement would be unreasonable and nonsensical.

of a [subsequent] dischargeability claim, collateral estoppel precludes the debtor from relitigating those underlying facts in bankruptcy court." *French Kezelis & Kominiarek, P.C. v. Carlson*, No. 99 C 6020, 2000 WL 226706, at *4 (N.D. Ill. Feb. 22, 2000) (citing *Klingman*, 831 F.2d at 1294–95).

The Debtor's suggestion that the applicability of collateral estoppel is problematic without a written decision by the state court is also unconvincing. As a matter of "procedural reasonableness," courts are generally not required to issue a written opinion in every case decided on the merits.[14] *See, e.g., United States v. Wachowiak,* 496 F.3d 744, 749 (7th Cir. 2007), *abrogated on other grounds by Nelson v. United States,* 555 U.S. 350 (2009) (discussing such a requirement in the context of sentencing); Mathilde Cohen, *When Judges Have Reasons Not to Give Reasons: A Comparative Law Approach,* 72 Wash. & Lee L. Rev. 483, 490–91 (2015) (explaining that there is no "affirmative mandate" in the "Anglo-American tradition generally" to "write opinions for all cases decided on the merits"). Even the U.S. Supreme Court, although expected to explain its decisions and issue written opinions, "is not required to do so." Cohen, *supra*, at 494 n.60. Rather, courts need only explain their findings and conclusions in an adequate manner in order to promote fairness and allow for meaningful review. *See, e.g., Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (explaining that courts must "sufficiently articulate" the bases for their findings and conclusions (internal quotation omitted)).

Here, although the state court did not issue a written opinion, a transcript of the court's oral ruling is readily available. Based on that transcript, the Court finds that the state court sufficiently articulated the reasons for its findings and conclusions and provided "a logical

---

[14] The Court acknowledges that many states have practice rules that specify what kind of judgments must be reduced to writing or the extent to which a court must explain a decision in writing. The Debtor, however, has not identified any such rules that would have required the state court to issue its findings and conclusions in writing.

bridge" between those findings and conclusions and the evidence of record. *See Scott*, 297 F.3d at 595. Moreover, the judgment order issued on the Share Purchase Motion is consistent with the record of the proceedings, and the court's findings, "including, but not limited to, findings of fraud against" the Debtor, are "adopted and incorporated by reference" in that order. (Dkt. 1, Ex. H.)

Next, the Debtor argues that collateral estoppel is not properly applied to this matter because the state court resolved only one count of a multi-count complaint,[15] and "the bulk of the facts remain unproven and subject to dispute." (Dkt. 47 at 4.) This argument misses the mark.

The Plaintiff is neither asking this Court to decide the merits of the other counts of the state court complaint nor seeking a determination of nondischargeability of the claims in those counts. Moreover, although some of the state court's factual findings in its ruling on the Share Purchase Motion may be applicable to other counts of the state court complaint, any facts that are "unproven and subject to dispute" in the other counts remain that way, and the parties can offer arguments about those facts in future state court proceedings.

Finally, the Debtor contends that only the factual findings in the state court's ruling on the Share Purchase Motion and the corresponding judgment order may be given preclusive effect.[16] In contrast, the Debtor argues, the Plaintiff is asking the Court to determine that

---

[15] The Court notes that the state court's ruling on December 13, 2019 actually resolved the Plaintiff's Share Purchase Motion—not technically Count 18 of the state court complaint. True, the Plaintiff alleges in both the Share Purchase Motion and Count 18 that the Debtor violated § 12.56 of the IBCA. However, the Motion was filed as a result of the Debtor's conduct over the eleven months following the Plaintiff's filing of the original complaint, rendering some of the twenty-one requests in the plea under Count 18 no longer applicable. Thus, the Motion and the court's subsequent ruling thereon are related to but also separate from Count 18.

[16] The Debtor suggests that the findings in the state court's ruling on March 10, 2020 may also be given preclusive effect. (*See* Dkt. 47 at 5.) In support of its fee award to the Plaintiff in that ruling, the court merely reiterated the findings from its ruling on the Share Purchase Motion. (*See* Dkt. 1, Ex. G at 10:6–11:8.)

31

collateral estoppel is applicable to the contents of every document produced in discovery over the course of the state court litigation. The Debtor misinterprets the Plaintiff's argument.

The Plaintiff contends, instead, that the Debtor may not base his defenses in this matter on factual findings in which the state court found no merit. Indeed, the very purpose of collateral estoppel is to bar a debtor from re-litigating in the bankruptcy court the underlying facts decided in a prior proceeding. The parties are reminded, however, that although the facts in every document in the state court case will not be given preclusive effect here, the Court may consider the full record from the prior state court suit, as well as extrinsic evidence, in making its nondischargeability determination. *See Brown*, 442 U.S. at 127–28, 138–39.

## 2.  Exceptions to Discharge

The Plaintiff argues that he entitled to judgment as a matter of law under §§ 523(a)(2)(A), (a)(4), and (a)(6) because the state court's findings satisfy the requisite elements under those statutory provisions. As the party seeking to establish an exception to discharge, the Plaintiff bears the burden of proof by a preponderance of the evidence. *See Grogan*, 498 U.S. at 291; *In re Bero*, 110 F.3d 462, 465 (7th Cir. 1997). Exceptions to discharge must be construed strictly against the plaintiff and liberally in favor of the debtor. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011). Although the burden of going forward with the evidence may occasionally shift, the ultimate burden remains with the plaintiff. *Sears, Roebuck & Co. v. Green (In re Green)*, 296 B.R. 173, 179 (Bankr. C.D. Ill. 2003); *see also Penix v. Parra (In re Parra),* 483 B.R. 752, 774 (Bankr. D.N.M. 2012).

## A.  Section 523(a)(2)(A)

32

First, the Plaintiff argues that he is entitled to judgment as a matter of law under § 523(a)(2)(A). That statute excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A). Three separate grounds for nondischargeability are included under § 523(a)(2)(A): false pretenses, false representation, and actual fraud. *Asher v. Petti (In re Petti)*, Bankr. No. 19-00667, Adv. No. 19-00592, 2022 WL 3973380, at *2 (Bankr. N.D. Ill. Aug. 31, 2022). The Plaintiff invokes only the "actual fraud" prong in support of his motion for summary judgment.[17]

To except the judgment debt from discharge based on actual fraud under § 523(a)(2)(A), the Plaintiff must demonstrate that: (1) actual fraud occurred; (2) the Debtor intended to defraud the Plaintiff; and (3) the Debtor's actual fraud created the debt at issue. *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001).

Unlike false pretenses and false representation, actual fraud requires neither a misrepresentation, *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 359 (2016), nor reliance, *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000). Encompassing a broad spectrum of circumstances, it consists of "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *Id.* at 893 (internal quotation omitted). "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth." *Id.* It includes "anything calculated

---

[17] In his adversary complaint, the Plaintiff cites to all three prongs as grounds for nondischargeability under § 523(a)(2)(A). The arguments in the Plaintiff's memorandum in support of his motion for summary judgment, however, are based primarily on "actual fraud."

33

to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture." *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 531 (7th Cir. 1992) (internal quotation omitted).

As to the intent element, the Plaintiff must prove that the Debtor subjectively intended to deceive him at the time the fraudulent conduct occurred. *See Gasunas v. Yotis (In re Yotis*), 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016); *Baermann v. Ryan (In re Ryan*), 408 B.R. 143, 157–58 (Bankr. N.D. Ill. 2009). Because direct proof is rarely available, intent to deceive "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan (In re Logan*), 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (internal quotation omitted). Thus, fraud may be inferred if the circumstances collectively suggest that the debtor intended to cheat or otherwise deceive the plaintiff. *Ryan*, 408 B.R. at 157.

In this matter, the findings of the state court, supported by the parties' statements and responses in the adversary proceeding and the state court evidence of record, amply provide the necessary factual support for nondischargeability under the actual fraud prong of § 523(a)(2)(A). Those findings establish that the Debtor engaged in fraudulent and deceitful conduct designed to cheat the Plaintiff by stripping him of his ownership interest in TEAM.

The state court record and the parties' statements and responses establish that the Debtor engaged in a variety of deceitful activities, even before his involvement in the establishment of CAS. Among those activities, the Debtor prevented the Plaintiff from accessing TEAM's financial records and accounts and failed to include the Plaintiff in decision making in

34

connection with the company, despite the fact that the Plaintiff was, at all times relevant to this matter, a shareholder, officer, and director of the corporation. As to the latter, the Debtor made unilateral decisions to file lawsuits against various TEAM customers that had been referred to the company by TEA and, at the same time, gave credits to those customers that he had brought over to TEAM. The Debtor also unilaterally stopped paying the Plaintiff compensation through the corporation and cancelled the life, health, and disability insurance provided to the Plaintiff by TEAM, all without consulting the Plaintiff or getting his consent.

As to CAS, the state court found that the Debtor was actively involved in the formation of the competing aviation maintenance company. According to the transcript of its ruling, the court was "convinced that CAS d[id] not become an entity without" the Debtor, despite the fact that CAS was established under someone else's name. (Dkt. 1, Ex. F at 9:20–21.) Not only was the Debtor working for the new company, the court said, but he was also responsible for "directing TEAM clients to CAS" while he was still an officer and director of TEAM. (*Id*. at 9:19–22; *see also id.* at 12:9–10.) In fact, only four weeks after being launched, CAS had fifty-nine clients, fifty-four of which had formerly been TEAM's customers.[18] In addition, the court found that after entry of its order laying off TEAM's employees, all but two were immediately hired by CAS.

Based on the foregoing, the state court was "convinced beyond all doubt that CAS is basically the new TEAM." (*Id.* at 9:23–24; *see also id.* at 11:2–3 (finding that "[t]his new business is basically the same business as TEAM").) Cirrus, the source of considerable business

---

[18] The state court found that CAS was "servicing 98 percent of TEAM's clients." (Dkt. 1, Ex. F at 10:23–24; *see also id.* at 12:12–13.) At trial, however, Debtor's counsel stipulated that fifty-four of CAS's fifty-nine customers had formerly been doing business with TEAM. (Tr. at 371:16–372:1.) Although the latter is 91.5%, the upshot is the same: The vast majority of CAS's customers came over directly from TEAM.

for TEAM, and subsequently for CAS, had the same impression, noting in its records that the "entire employee group" from TEAM "ha[d] moved two hangars down and is now" CAS. (Dkt. 45 ¶ 63; Dkt. 30, Ex. I-25.)

In sum, the state court's findings, the evidence of record from the prior proceedings, and the Debtor's admissions demonstrate that the Debtor dishonestly took TEAM's assets for his own use, restricted the Plaintiff's access to financial information about TEAM, engaged in self-dealing by making unilateral business decisions that ultimately harmed both the Plaintiff and TEAM, and was categorically instrumental in the establishment of a rival aviation business. Through these actions, the Debtor deceived the Plaintiff and allowed the Debtor to gain an advantage over him.

The Debtor does not deny that his conduct was deceitful or otherwise improper. Rather, he advances two primary arguments in his defense, both of which center on the intent element of § 523(a)(2)(A). First, the Debtor argues that the state court made no factual finding regarding his intent, other than to "parrot" the statutory requirements under the IBCA, in concluding that his conduct was "deceptive, oppressive, and fraudulent." (Dkt. 47 at 6–7 (quoting Dkt. 1, Ex. F at 13:22–24).) Second, the Debtor contends that he did not subjectively intend to deceive the Plaintiff at the time the fraudulent actions occurred. Instead, the Debtor says, his intent in establishing CAS was to protect TEAM's employees who would be without jobs after the court-ordered layoff. Similarly, the Debtor claims that he sought to dissolve TEAM not to harm the Plaintiff but because the business was not salvageable. The Debtor's arguments are erroneous.

First, although the state court echoes the requirements to prevail under the IBCA, its ruling also contains factual findings that sufficiently satisfy the intent element under

36

§ 523(a)(2)(A). Specifically, based on the documentary and testimonial evidence at trial, the court found that the creation of CAS was "the culmination of a plan" by the Debtor to "sink" TEAM through "an improper pattern of conduct." (Dkt. 1, Ex. F at 11:20–22, 13:17–19, 14:5–9.) In fact, observing that many of the cases that come before the state court generally involve disputes brought by equal corporate shareholders, the judge noted that "[t]his [wa]s the first time [he had] seen one 50 percent owner/officer/director sink a business" the way the Debtor had done here. (*Id.* at 11:7–22.) Indeed, the court noted that it was "convinced that [the Debtor] saw an opportunity to abandon TEAM as it was sinking" and to use Siracusano to create the new business. (*Id.* at 12:18–21; *see also id*. at 10:20–23.) Ultimately, the court expressly found that the Debtor's conduct was "deceptive, oppressive, and fraudulent" with respect to both the Plaintiff and TEAM. (*Id.* at 13:22–24.)

Second, the state court's factual findings contradict the Debtor's claim that he created CAS to provide TEAM's employees with jobs after they had been laid off. Reiterating that all but two TEAM employees went immediately to work for CAS after the effective date of the layoff and that most of CAS's customers were those that had previously been loyal to TEAM, the court found that it was clear that the formation of the new business was the Debtor's "plan from a certain point[,] . . . *well before the [c]ourt order . . . laying off TEAM's employees*." (*Id.* at 12:14–17 (emphasis added).) In fact, the state court record establishes that prior to the entry of the layoff order, various activities aimed at creating a new business were already taking place behind the scenes. Specifically, the Debtor was attending meetings, addressing concerns, and having discussions with others—all with the goal forming a competing aviation maintenance

37

company.[19] As such, the Debtor's intent in creating CAS could not have been to preserve the jobs of TEAM's employees, because the Debtor's plan to create a new company had begun "well before" the court laid off those employees.

Likewise, the findings in the state court's ruling negate the Debtor's contention that he sought dissolution of TEAM not to gain an advantage over or otherwise harm the Plaintiff but because the company was unsalvageable. Specifically, the Debtor claims that, based on the reports of the court-appointed receiver, he filed motions to dissolve TEAM—on July 2, 2019 and August 5, 2019—because the company did not generate sufficient funds to sustain operations without external financial support from the shareholders or a third-party investor. (*See* Dkt. 50 ¶¶ 6, 8; Dkt. 46-2.) According to both motions, the closure of the business was "inevitable," based on TEAM's revenues, collections, and disbursements, as well as the company's anticipated negative cash flow. (Dkt. 30, Ex. M ¶ 19, Ex. N ¶ 8.) Relying on the representations in the motions, the state court laid off TEAM's employees and directed the receiver to wind down the business.

In reconsidering those representations, the state court found that, in addition to his deceitful conduct designed to cheat the Plaintiff, the Debtor's actions in seeking dissolution of TEAM were deceptive to the court and also violated the initial TRO that had been entered back in October 2018. Further, contrary to the Debtor's contention that TEAM was "insolvent or on

---

[19] For example, Leigh Brunelle, the office manager for TEAM (and subsequently for CAS), testified at trial that in August 2019, she had had discussions with both the Debtor and TEAM employee Scot Severson about setting up a "hypothetical" mechanic shop. (Tr. at 385:17–386:5; *see also id.* at 76:7–11, 80:18–81:1, 89:11–15, 108:15–109:14.) She also testified that, around the same time, she talked to the Debtor and Severson about the enforceability of TEAM's employee confidentiality agreement. (*Id.* at 386:24–387:18; *see also id.* at 79:3–23.) Similarly, Matthew Kaseeska, president of Net Works Consulting Resources, Inc., testified at trial that sometime during the summer of 2019 he provided a PowerPoint presentation to the Debtor, Brunelle, and Severson on the services that his company could provide for CAS. (*Id.* at 167:7–175:21.)

38

the verge of insolvency" on August 5, 2019 (*id.*, Ex. N ¶ 18), the state court found that the company was worth $800,000 as of August 31, 2019.[20]

In short, the factual findings of the state court, the record of the prior proceedings, and the Debtor's admissions present a "picture of deceptive conduct" on the Debtor's part and establish that he intended to cheat or otherwise deceive the Plaintiff. The requirement that the Debtor's fraud created the debt at issue is also satisfied, because the state court clearly grounded its judgment on the Debtor's deceitful conduct.

Based on the foregoing, the Court concludes that the state court's findings of fact satisfy all of the elements required for nondischargeability pursuant to the actual fraud prong of § 523(a)(2)(A). Thus, the Plaintiff is entitled to judgment as a matter of law under that statutory exception to discharge.

**B. Section 523(a)(4)**

Next, the Plaintiff contends that he is entitled to judgment as a matter of law pursuant to § 523(a)(4). According to that provision, a debtor cannot discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4). Thus, to demonstrate a claim under § 523(a)(4), the Plaintiff must prove that the Debtor committed: (1) fraud or defalcation while acting as a fiduciary; or (2) embezzlement; or

---

[20] As to the Debtor's claim that he based his dissolution motions on information in the receiver's reports, that information was undoubtedly provided to the receiver by either the Debtor himself or employees under his direction. Indeed, in his capacity as general manager and president, the Debtor had total control over TEAM's financials, records, and accounts, and, thus, the generation and dissemination of that information were under his control.

(3) larceny. *See id*. The Plaintiff has invoked only the fraud or defalcation prong of the statutory exception.[21]

In order to prevail under that prong, the Plaintiff must establish the following elements: (1) the existence of an express trust or fiduciary relationship between him and the Debtor; and (2) fraud or defalcation committed by the Debtor in the course of that relationship. *See Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016); *Follett Higher Educ. Grp., Inc. v. Berman (In re Berman)*, 629 F.3d 761, 765–66, 768–69 (7th Cir. 2011); *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 477 (Bankr. N.D. Ill. 2011).

The Plaintiff does not allege that an express trust existed between him and the Debtor; rather, he contends that there was a fiduciary relationship between the parties.[22] The existence of a fiduciary relationship under § 523(a)(4) is a matter of federal law. *In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003); *Schaffer v. Dempster (In re Dempster)*, 182 B.R. 790, 801 (Bankr. N.D. Ill. 1995). Although "[b]ankruptcy law depends on, and implements, entitlements defined by state law . . . , which of these entitlements is subject to discharge . . . is beyond state control." *McGee*, 353 F.3d at 540. Thus, the Court turns to federal law to decide whether a fiduciary relationship existed between the Plaintiff and the Debtor.

---

[21] Although the Plaintiff alleges conversion and embezzlement in his adversary complaint (Dkt. 1 ¶¶ 1, 34, 35, 116–118, 122, 179–187, 254–258), the arguments in his memorandum in support of his motion for summary judgment focus only on the fraud or defalcation prong of § 523(a)(4).

[22] "An express trust requires an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust." *ColeMichael Invs., L.L.C. v. Burke (In re Burke)*, 405 B.R. 626, 648 (Bankr. N.D. Ill. 2009), *aff'd*, 436 B.R. 53 (N.D. Ill. 2010). The Plaintiff alleges in his adversary complaint that there was an express trust between the parties. (Dkt. 1 ¶¶ 169, 170.) He does not use the term correctly, however, as reflected in his statements that the Debtor "held" the Plaintiff's "express trust as evidenced by [the Debtor's] job responsibilities . . . ." (*Id.*) The Plaintiff makes no allegation of an express trust in his memorandum in support of his summary judgment motion, arguing instead only that the Debtor acted as a fiduciary at all times relevant to this matter.

40

In the Seventh Circuit, a fiduciary relationship may arise for purposes of § 523(a)(4) when there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994); *Stair One, Inc. v. Hivon (In re Hivon)*, Bankr. No. 14 B 26441, Adv. No. 14 A 710, 2015 WL 687124, at *6–7 (Bankr. N.D. Ill. Feb. 13, 2015) (quoting *Marchiando*); *see also Berman*, 629 F.3d at 769–70 (explaining that a relationship "in which one party to the relation is incapable of monitoring the other's performance" satisfies the § 523(a)(4) requirement (internal quotation omitted)); *McGee*, 353 F.3d at 541 (noting that "many fiduciary relations are characterized by disparities in the knowledge . . . of the participants"). Only fiduciary duties existing prior to the debt fall within the ambit of the statutory exception. *Berman*, 629 F.3d at 769.

In this matter, the state court's findings and the evidence of record sufficiently establish that the Debtor had fiduciary obligations to the Plaintiff for purposes of § 523(a)(4). That the parties were equal shareholders does not preclude a fiduciary relationship, because the ascendancy test "looks to economic realities rather than labels." *See Catrambone v. Adams*, 498 B.R. 839, 848–49 (N.D. Ill. 2013). The economic realities here reveal a substantial inequality in both knowledge and power between the parties.

According to the state court record and the Debtor's admissions, after joining the company as an owner, officer, and director in 2006, the Debtor had substantially more knowledge about and control of TEAM than the Plaintiff did. In fact, the Debtor testified that he devoted all of his time to TEAM, while the Plaintiff was not involved at all. Although the parties were equal shareholders, the Debtor managed all operations of TEAM and had complete

41

authority over the company's financials, records, and accounts. He was also responsible for the management of TEAM's employees and testified that all activities and actions taken by those employees were under his supervision as president of the corporation. (Tr. at 42:13–16; Dkt. 45 ¶ 21.) As discussed above, the Debtor provided the Plaintiff with little to no information about the operation or affairs of the company—making it impossible for the Plaintiff to monitor the Debtor's activities or performance—and unilaterally made significant decisions affecting both the Plaintiff and TEAM, without consulting the Plaintiff, including him in the decision making, or getting his consent.

Based on the evidence of record in the state court, as well as the parties' statements and responses, the Court concludes that the Debtor had superior knowledge and power that gave him a position of ascendancy over the Plaintiff. Given that ascendant position, the Court holds that a fiduciary relationship existed between the parties for purposes of § 523(a)(4).[23]

As for the second element of the statutory exception, the state court's findings, the record of the prior proceedings, and the Debtor's admissions also establish both defalcation and fraud. As the requirements for fraud have already been set forth above, they will not be repeated here. Instead, the Court turns its attention to the requisites for a finding of defalcation.

---

[23] The Debtor argues that the Plaintiff is not entitled to judgment as a matter of law under § 523(a)(4) for two reasons based on the ascendancy test. First, the Debtor contends that a genuine issue of material fact exists as to which party held an ascendant position over the other. Arguing that the Plaintiff had more control than he did, the Debtor asserts in both his memorandum in opposition to the summary judgment motion and his statement of additional facts that the Plaintiff controlled TEAM's primary location and also owned TEA, the company purportedly responsible for at least half of TEAM's revenue. (Dkt. 47 at 9–10; Dkt. 50 ¶ 4.) The Debtor rests on these mere allegations, failing to either provide further detail or support them with citations to the record as required by Local Rule 7056-2(A)(2)(b). Without more, the bald and unsupported allegations are of no moment.

Second, the Debtor claims that the state court did not discuss or establish that he held an ascendant position over the Plaintiff. (Dkt. 47 at 9.) Demonstrating a difference in knowledge or power between fiduciary and principal is one way to establish a fiduciary relationship under § 523(a)(4)—not under Illinois law. Thus, there would have been no reason for the state court to discuss or find that the Debtor held an ascendant position over the Plaintiff.

Although not defined in the Bankruptcy Code, "defalcation" loosely means "'a nonfraudulent default.'" *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 272 (2013) (quoting *Black's Law Dictionary* 479 (9th ed. 2009)). The term has also been defined as the "failure to meet an obligation; [the] misappropriation of money held in a fiduciary capacity; [and the] failure to properly account for such funds." *S. Cal. Gas Co. v. Collier,* Bankr. No. 08 B 22708, Adv. No. 08 A 01008, 2010 WL 1241778, at *4 (Bankr. N.D. Ill. Mar. 23, 2010) (internal quotation omitted); *see also Zitt v. Roberts (In re Roberts)*, Bankr. No. 10 B 06420, Adv. No. 10 A 01298, 2011 WL 4102540, at *7 (Bankr. N.D. Ill. Sept. 14, 2011).

Even though intent or bad faith is not necessary, the United States Supreme Court has held that, for purposes of § 523(a)(4), defalcation requires knowledge of or gross recklessness with respect to the improper nature of the fiduciary's conduct. *Bullock*, 569 U.S. at 273–74; *see also Meyer,* 36 F.3d at 1385 (holding that defalcation requires at least reckless conduct). Specifically, the Supreme Court has explained that defalcation "requires an intentional wrong" and that "[w]here actual knowledge of wrongdoing is lacking, [the Court] consider[s] conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *Bullock*, 569 U.S. at 273–74 (internal quotations omitted).

In this matter, the state court findings and record, as well as the Debtor's admissions, demonstrate that the Debtor failed to meet obligations that he owed to the Plaintiff and that he engaged in fraudulent and deceitful conduct, both by virtue of his ascendant position over the Plaintiff. As discussed above, the Debtor would not share information about TEAM with the Plaintiff and unilaterally decided to stop paying him, to cancel his insurance, to bring suit against

43

customers that had been referred to TEAM by the Plaintiff, and to provide credits to customers that the Debtor himself had brought over to TEAM. The Debtor also moved to dissolve TEAM and, at the same time, formed a competing aviation maintenance company to which he directed most of TEAM's customers and employees, all while he served as an officer, director, and shareholder of TEAM. In every instance, the Debtor acted knowingly and purposefully, making self-serving business decisions and intentionally "sinking" TEAM in order to establish CAS. The Debtor had to have known that his failure to contact the Plaintiff about decisions that would adversely affect him was wrong, and he acted with gross recklessness, consciously disregarding the "substantial and unjustifiable risk" that his actions would result in the violation of his fiduciary duty to the Plaintiff.

When viewed in the aggregate and in light of the evidence of record, the state court's findings comprise the elements of a nondischargeability claim under § 523(a)(4). The Debtor owed a fiduciary duty to the Plaintiff for purposes of the statutory exception by virtue of his superior knowledge and power, and he committed fraud and defalcation while acting as a fiduciary. The requirement that the fiduciary duty existed prior to the debt has also been satisfied, because the Debtor was clearly a fiduciary before the judgment debt arose. Accordingly, the Plaintiff is entitled to judgment as a matter of law pursuant to § 523(a)(4).

### C. Section 523(a)(6)

Finally, the Plaintiff argues that he is entitled to judgment as a matter of law under § 523(a)(6), which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). To demonstrate a claim under § 523(a)(6), the Plaintiff must prove that the Debtor: (1) intended to

44

and caused an injury; (2) acted willfully; and (3) acted maliciously. *See In re Calvert*, 913 F.3d 697, 700 (7th Cir. 2019); *Mut. Mgmt. Servs., Inc. v. Fairgrieves (In re Fairgrieves)*, 426 B.R. 748, 756 (Bankr. N.D. Ill. 2010).

For purposes of § 523(a)(6), "injury" means "the violation of another's legal right or the infliction of an actionable wrong." *Fairgrieves*, 426 B.R. at 757. "Injuries contemplated by § 523(a)(6) are not confined to physical damage." *Nicholas & Assocs., Inc. v. Morgan (In re Morgan)*, Bankr. No. BR 09 B 42248, Adv. No. 10 A 00253, 2011 WL 3651327, at *7 (Bankr. N.D. Ill. Aug. 18, 2011). An injury to intangible financial interests also meets the requirement. *See, e.g., Oberg v Chrispin (In re Chrispin)*, Bankr. No. 10 B 47833, Adv. No. 11 A 00443, 2012 WL 3126807, at *15–17 (Bankr. N.D. Ill. July 31, 2012) (holding debt nondischargeable under § 523(a)(6) where defendant knowingly acted to cause financial injury to plaintiff without just cause or excuse). In this matter, the parties do not dispute that the Debtor caused the Plaintiff to be injured by exercising control over TEAM and ultimately stripping the Plaintiff of his ownership interest in the company. Accordingly, the first element of § 523(a)(6) has been satisfied, and the only issues left to be decided are whether the Debtor caused the Plaintiff's injuries by conduct that was willful and malicious.

Under § 523(a)(6), willfulness requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (quoting *Geiger*). In other words, "willful" means intent to cause injury, not simply the commission of an intentional act that results in injury. *Koplin v. Ginsberg (In re Ginsberg)*, Bankr. No. 08 B 30836, Adv. No. 09 A 188, 2009 WL 4891815, at *5 (Bankr. N.D. Ill. Dec. 16, 2009) (citing *Geiger*); *Rae v.*

45

*Scarpello (In re Scarpello)*, 272 B.R. 691, 704 (Bankr. N.D. Ill. 2002) (same). Negligently or recklessly inflicted injuries do not fall within the ambit of § 523(a)(6). *Geiger*, 523 U.S. at 64. For purposes of the statutory exception, "willfulness" can be found if either the Debtor subjectively intended to injure the Plaintiff or knew that injury was substantially certain to result from his acts. *See Horsfall*, 738 F.3d at 774 (explaining that a plaintiff can establish "willfulness" by showing that the "debtor's motive was to inflict the injury . . . or the debtor's act was substantially certain to result in injury" (internal quotation omitted)); *see also Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir. 2015) (quoting *Horsfall)*. "Because a person will rarely admit to acting in a willful and malicious manner, those requirements must be inferred from the circumstances surrounding the injury." *ColeMichael Invs., L.L.C. v. Burke (In re Burke)*, 398 B.R. 608, 626 (Bankr. N.D. Ill. 2008).

Here, the state court's ruling, the record from the prior proceedings, the parties' statements and responses in this adversary, and the surrounding circumstances all support a finding that the Debtor either intended to cause injury to the Plaintiff or was substantially certain that injury would result from his actions. The Debtor does not deny that notes from a meeting at which he, Brunelle, and TEAM's attorney were present reflect a discussion of various actions contemplated to "make [the Plaintiff] nervous" and to "get [the DuPage] airport to blacklist [him]."[24] (Dkt. 45 ¶ 34.) After that meeting, the Debtor stopped paying the Plaintiff, cancelled his insurance, and sought to dissolve TEAM. Subsequently, the Debtor presented Siracusano with the opportunity to create a new competing business in order "to hurt, in some fashion," the Plaintiff. (Dkt. 1, Ex. F at 12:18–13:6.) The creation of CAS was "the culmination of a plan" by

---

[24] In response to paragraph 34 in the Plaintiff's statement of facts, the Debtor denies not the contents of the notes but the "inferences drawn from" them. (Dkt. 45 ¶ 34.) As set forth above, however, the Debtor's intent "must be inferred from the circumstances surrounding the injury." *Burke*, 398 B.R. at 626.

46

the Debtor to "sink" TEAM through "an improper pattern of conduct." The Debtor simply had to have known, without doubt, that injury to the Plaintiff was substantially certain to result from his actions. There is no other logical conclusion.

As to the malice element, conduct is "malicious" if it is undertaken "in conscious disregard of one's duties or without just cause or excuse." *Calvert*, 913 F.3d at 700–01 (internal quotations omitted); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (internal quotation omitted); *see also Horsfall*, 738 F.3d at 774 (quoting *Thirtyacre)*; *Fairgrieves*, 426 B.R. at 757. Accordingly, to establish malice under § 523(a)(6), the Plaintiff must prove that the Debtor (1) intentionally committed a wrongful act, (2) which caused injury to the Plaintiff, and (3) which was done without just cause or excuse. *See Shriners Hosp. for Child. v. Bauman (In re Bauman)*, 461 B.R. 34, 49 (Bankr. N.D. Ill. 2011); *Vozella v. Basel-Johnson (In re Basel-Johnson*), 366 B.R. 831, 850 (Bankr. N.D. Ill. 2007). The Debtor need not have acted with ill will or a specific intent to harm the Plaintiff in order for his conduct to be considered malicious. *See id.*

In addition to establishing that the Debtor intentionally committed a wrongful act which caused injury to the Plaintiff, as discussed *supra*, the facts demonstrate that the Debtor acted "without just cause or excuse," thus satisfying the malice element of § 523(a)(6). The Debtor, however, offers two primary reasons for his conduct, which, he suggests, show that he was not motivated by an intent to harm the Plaintiff. Specifically, the Debtor says, he sought to dissolve TEAM because the company was insolvent, and he established CAS to provide jobs for the employees who had been laid off from TEAM. As discussed at length above, the state court's ruling invalidates these explanations because the court found that the Debtor's attempt to dissolve TEAM was deceptive and violated the TRO, that TEAM was worth $800,000 at or

47

around the time the second motion to dissolve was filed, and that the Debtor planned to form CAS "well before" the entry of the order laying off TEAM's employees. As such, the Debtor cannot demonstrate that he acted with "just cause or excuse."

In sum, the Court holds that the state court findings, the evidence of record, and the Debtor's admissions establish the elements required for a claim under § 523(a)(6). Thus, the Plaintiff is entitled to judgment as a matter of law under that statutory exception.

## CONCLUSION

For the foregoing reasons, the Court finds that the Debtor is precluded from re-litigating the factual issues decided by the state court and that those facts establish, as a matter of law, that the entire debt at issue is excepted from discharge pursuant to §§ 523(a)(2)(A), (a)(4), and (a)(6). As such, the Plaintiff's motion for summary judgment on Counts I, III, and V will be granted, and judgment will be entered on those counts of the adversary complaint in favor of the Plaintiff. A separate order will be entered consistent with this Memorandum Opinion.

Dated: **September 8, 2022**          ENTERED:

Janet S. Baer
United States Bankruptcy Judge

48